**780-15    781-15**

No. _____

IN THE

COURT OF CRIMINAL APPEALS

OF TEXAS

ORIGINAL

FILED IN
COURT OF CRIMINAL APPEALS

SEP 17 2015

Abel Acosta, Clerk

RECEIVED IN
COURT OF CRIMINAL APPEALS

SEP 15 2015

Abel Acosta, Clerk

JOSEPH JULIAN GUERRA
Appellant

VS.

STATE OF TEXAS

PETITION IN CAUSE No's. 219-82353-2012 and 219-81886-2013
FROM THE 219th DISTRICT COURT OF COLLIN COUNTY, TEXAS
AND APPEAL No's. 05-14-00086-CR, 05-14-00087-CR
FROM THE COURT OF APPEALS FOR THE
FIFTH COURT OF APPEALS DISTRICT OF TEXAS

## PETITION FOR DISCRETIONARY REVIEW

ORAL ARGUMENT REQUESTED

Joseph Julian Guerra
# 1909129
Robertson Unit
12071 F.M. 3522
Abilene, TX 79601

PRO SE

# IDENTITY OF PARTIES AND COUNSEL

Pursuant to TEX. R. App. P 38.1(a), the parties to this suit are as follows:

1. Appellant - Joseph Julian Guerra

2. Appellate Attorney for Appellant

    Christian T. Souza - Representation in the 5th Court of Appeals
    SBN: 00785414
    4303 N. Central Expressway
    Dallas, Texas 75205

Trial Attorney

    Glenn Adams
    McKinney, Texas

3. Prosecutors

    Cynthia Walker - Assistant District Attorney
    Grey Willis - on appeal
    Collin County District Attorney's Office
    2100 Bloomingdale Road, Suite 100
    McKinney, Texas 75071

4. Trial Judge Scott Becker
    219th District Collin County
    Mckinney, Texas

# TABLE OF CONTENTS

IDENTITIES OF PARTIES AND COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . 1

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

WORD COUNT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . 5

GROUND FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

GROUND FOR REVIEW

The Court of Appeals erred when it upheld the trial courts denial of his Batson Claim when it did not consider all evidence relevant with respect to other black venire members against whom the prosecutor exercised premptory challenges, specifically it did not consider occupation and employment status as suggesting a liberal group bias in combination with punishment rating scores as not being race neutal explaination, where the State never questioned the venire person for liberal traits conserning a venire person with scores ranked highest for punishment.

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . 9

APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

# INDEX OF AUTHORITIES

CONSTUTION

U.S. CONST AMEND. 6th . . . . . . . . . . . . . . . . . . . . . . . .

U.S. CONST AMEND. 14th . . . . . . . . . . . . . . . . . . . . . . .

STATUTES

TEX. CODE CRIM. PROC art. 35.261 . . . . . . . . . . . . . . . . . .

CASES

Batson-v-Kentucky, 476 U.S. 79 (1986) . . . . . . . . . . . . . . . .

Emerson-v-State, 851 S.W.2d 269 (Tex. Crim. App. 1993) . . . . . . . .

Esteves-v-State, 859 S.W.2d 613 (Tex. Crim. App. 1993) . . . . . . . .

Whitsey-v-State, 796 S.W.2d 707 (Tex. Crim. App. 1990) . . . . . . . .

# WORD COUNT

Pursuant to TEX. R. App. P. 9.4(i)(2)(O) the word count from the beginning of the argument until, but excluding the signature block, is <u>1012</u>.

TO THE COURT OF CRIMINAL APPEALS OF TEXAS,

Joseph Julian Guerra petitions this Honorable Court to review the judgement affirming his convictions for aggravated assault and aggravated kidnapping in Cause No. 219-82353-2012 and 219-81886-2013,

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant, Joseph Julian Guerra requests oral argument before the Court of Criminal Appeals of Texas, because oral argument will assist the Court in determining whether the Court of Appeals erred when it determined that petitioner did not carry burden to show that the trial courts denial of his Batson challenge was clearly erroneous.

## STATEMENT OF THE CASE

The Appellant was charged by indictments with the offenses of aggravated assault and aggravated kidnapping. A jury convicted him and assessed punishment in each case at sixty years imprisonment and a $10,000.00 fine. The Court of Appeals for the 5th Court of Appeals District of Texas affirmed the judgement and sentence on June 10th, 2015, in an opinion not designated for publication.

## STATEMENT OF PROCEDURAL HISTORY

A three-Justice panel of the Court of Appeals rendered its opinion on June 10th, 2015. Guerra-v-State, 05-14-00086-CR, 05-14-00087-CR (Tex. App - Dallas June 10th, 2015), pet. filed)(mem. op., not designated for publication). Subsequently petitioner filed a motion for an extention of time which the Court of Criminal Appeals extended his time to file a petition for discretionary review to September 08, 2015. PD-0781-15, PD-0780-15. He files this petition timely in concurrance with this date.

## GROUND FOR REVIEW

The Court of Appeals erred when it upheld the trial courts denial of his Batson Claim when it did not consider all evidence relevant with respect to other black venire members against whom the prosecutor exercised premptory challenges, specifically it did not consider occupation and employment status as suggesting a liberal group bias in combination with punishment rating

-5-

scores as not being race neutral explaination, where the State never questioned the venire person for liberal traits conserning a venire person with scores ranked highest for punishment.

ARGUMENT

## REASON FOR GRANTING REVIEW

The Court of Appeals affirmed Appellants Batson claim holding that the State provided the Court with a credible, race neutral explaination for its chellenged strikes on three minority black members that were stricken from the jury pool. In respects to this decision, petitioner argues this finding did not consider the state giving an explaination of Group Bias where the group trait is not shown to apply and a venires punishment rating scores. The sole venire member Appellant focuses on is Venire member Ms Redmond, Juror # 47, who was a professor of Broadcast Journalism. The states exclusive reasoning for striking her was that due to her liberal characteristics this venire member would be more likely to punish less than she wanted. The Court of Appeals completely ignored that this member scored on her punishment ranking score the highest for her inclination to punish someone harshly. Without considering this liberal group bias and no questions being asked of this juror it did not consider all relevant evidence for the disposition of this ground.

## THE SALIENT FACTS

This petition conserns a conducted Batson hearing at petitioners trial. Therefore, the statement of facts in this petition will limit itself only to the facts salient to this ground of review.

At petitioners trial there were five African people on the venire panel. One was removed by agreement, one was struck by Guerra and three were struck by the State. Following voir dire, Guerra raised, and the trial court denied, a Batson challenge to the State's three strikes. See Batson-v-Kentucky, 176 U.S. 79, 89 (1986).

The sole juror contested in this petition is Panel Member 47, venire member Ms. Redmond. She was a college broadcast journalism professor, prior to voir dire a punishment range score was given by defense counsel and the presecutor. On the defense counsels score she ranked 7 out of 7 and on the prosecutors score she ranked 3 out of 3. Both of these scores indicated

she had the highest inherent ability to emphasize punishment when sentencing someone appropriately.

When the prosecutor gave their response to using a race neutral explaination for striking this juror they said they considered "certain types of professions... psychologist, social sciences, journalism... typically a little more liberal than other types." She further explained "I'm looking at people I think might be a little more liberal, might be people who would punish less than I want, and in my mind that's a professor of Journalism" (COA op. p15). She also said that this panel member had a relative accused of a crime in California and had expressed the opinion that the bail was too high in that case. On direct appeal in the Fifth Court of Appeals Guerra argued that the State struck panel member 47 "because of her allegedly liberal profession, a college professor" (Group Bias) and that the strike "showed disparte treatment, as other highly educated non minorities were not struck".

The Court of Appeals rejected petitioners Batson claim. Although this opinion rejected his claim of disparate treatment it failed to consider and answer his claim as to if the State gave an explaination of Group Bias where the group trait is not shown to apply. The Court of Appeals also erroneously Denied his Motion for Inclusion of Premptor Strike, Courtlists, and Juror information cards in Record for the Support of his Batson Claim.

## THE COURT OF APEALS HOLDING

The Court of Appeals held that the record "shows that the state provided the Court with a credible, race-neutral explaination for the challenged strikes. The trial court found the State's reasons for striking the potential jurors to be non-discriminatory. The record supports those findings, which are not clearly erroneous."

THE STATE DID NOT PROVIDE A RACE-NEUTRAL EXPLAINATION FOR ITS CHALLENGED STRIKE OF MS. REDMOND, JUROR #47 BECAUSE IT GAVE AN EXPLAINATION OF GROUP BIAS WHERE THE GROUP TRAIT IS NOT SHOWN TO APPLY

The Court of Criminal Appeals has consistently held that occupation and employment status suggesting liberal bias is not a valid race neutral explaination capable of rebutting a Batson Challenge, where the State never questioned the venire person about the alleged Group Bias where the group trait has shown not to apply. Emerson-v-State, 851 S.W.2d 269 (Tex. Crim. App. 1993); Whitsey-v-State, 796 S.W.2d 707 (Tex. Crim. App. 1990). In both

-7-

these cases the prosecutor struck a venire member whose occupation was within the field of a professor and a teaching assistant. The prosector in these cases gave explainations of striking these members on the notion of them being liberal. The Court of Criminal Appeals reversed both cases due to the States lack of meaningful questioning and the record as being insufficient to establish that this group trait of being liberal applied to them.

In the instant case, the Court of Appeals only answers petitioners claim as to disparate treatment. It quotes "Instead, the State struck her because of her profession and the subject matter she taught. When the prosecutor explained her reasons for the strike, she said she might not have struck a college professor who taught a different subject matter. Guerra did not identify other panelists who were college professors who were not struck or who had relatives involved in the criminal justice system and expressed a specific opinion about the system. Thus Guerra failed to prove the States reasons for the strikes were pretextual" (COA op. p16).

No where does it address the assertion that the profession as as a professor of Broadcast Journalism as being a pretext of group bias where the group trait has not been shown to apply for striking her. Whitsey-v-State Id. Petitioner reinterates the States sole reason was that by her being "liberal" she would be less likely to punish appropriately. But the fact of the matter is she scored highest on both punishment rating scales given by the prosecutor and the defense before trial. This sham of Group Bias is also compounded by the States lack of meaningful questioning of this venire member. Because the record is clear that the States classification of what "liberal" has shown not to apply at all to this venire member it thus truly did not consider all evidence relevant to the disposition of this Batson claim.

Normally, the Court of Criminal Appeals should defer to the factual findings of the Court of Appeals. However, where as in this case, the Court of Appeals reviews a case without considering all the relevant evidence, it should remand the cause for a new factual determination which takes into account all such material. Esteves-v-State, 859 S.W.2d 613 (Tex. Crim. App. 1993). In this case the alleged Group Bias and the erroneous denial of his motion for inclusion of premptory strikes, Courtlists and juror information cards.

## PRAYER FOR RELIEF

For the reasons herein alleged, the Court of Appeals erred in overruling Appellants fourth point of error in Appeal No.s 05-14-00086-CR, 05-14-00087-CR. Therefore, Appellant prays this Honorable Court GRANT this Petition, Order briefing and upon reviewing the judgement entered be loss, reverse the judgement of the Court of Appeals and remand this case to the Court of Appeals for review consistent with this Courts holding.

Respectfully Submitted,

Joseph Julian Guerra
\# 1909129
Robertson Unit
12071 F.M. 3522
Abilene, TX 79601

PRO SE

## CERTIFICATE OF SERVICE

I hereby certify that, pursuant to Rule 9.5 and 68.11 of the Texas Rules of Appellate Procedure, a true and correct copy of the above and foregoing Petition For Discretionary Review has been sent to Cynthia Walker, Collin County D.A. Office, 2100 Bloomingdale Road, Suite 100, McKinney, Texas 75071 and sent to the State Prosecuting Attorney, P.O Box 13046, Austin, Texas 78711. On this 2 nd day of September, 2015.

Joseph Julian Guerra
PRO SE

-9-

APPENDIX

Opinion of the Court of Appeals for the Fifth Court of Appeals District of Texas, Joseph Julian Guerra-v-State of Texas, Nos. 05-14-00086-CR, 05-14-00087-CR (Tex. App. - Dallas June 10th, 2015, Pet filed) (Mem. op) not designated for publication.

Affirmed as Modified and Opinion Filed June 10, 2015

In The

# Court of Appeals
## Fifth District of Texas at Dallas

No. 05-14-00086-CR

No. 05-14-00087-CR

JOSEPH JULIAN GUERRA, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 219th Judicial District Court
Collin County, Texas
Trial Court Cause Nos. 219-82353-2012, 219-81886-2013

# MEMORANDUM OPINION

Before Justices Francis, Lang-Miers, and Whitehill
Opinion by Justice Whitehill

A jury convicted Guerra of aggravated assault and aggravated kidnapping and assessed punishment in each case at sixty years' imprisonment and a $10,000 fine. In five issues, Guerra argues that (i) the trial court erroneously denied his motion to suppress because there were insufficient exigent circumstances to support a warrantless entry; (ii) the evidence is insufficient to support his aggravated assault conviction; (iii) the evidence is insufficient to support his kidnapping conviction; (iv) the trial court erroneously denied his *Batson* challenge; and (iv) the deadly weapon finding in the aggravated kidnapping judgment is a clerical error.

In a cross-point, the State requests that we modify both judgments to include the omitted $10,000 fines.

For the reasons discussed below, we modify the court's judgments to include the assessment of a $10,000 fine, and, as modified, affirm.

## I. Background

Several Allen police officers responded to a 2:30 a.m. 911 call. When they arrived at the scene, they found MD sitting in distress on a residential lawn. She had duct tape wrapped around her head, covering her mouth and pushing her nose up. Her hands and feet were bound with tape. She was crying and hysterical. She said that while she was in a home across the street, a man known as "Ace" (later identified as Guerra) assaulted her with a wrench and a frying pan, and that he had knocked out her tooth. The name "Ace" was carved into the skin of her legs and they were bleeding. She said that a one year old child was in the house from which she had escaped.

Concerned about the child's safety, the police entered the home without a warrant. Guerra was inside, asleep with the child. They arrested Guerra and charged him with aggravated assault and aggravated kidnapping. The police then obtained a search warrant and recovered a broken skillet, a knife with blood on it, a bloody towel, and a tooth. Before trial, Guerra moved to suppress this evidence claiming that the initial warrantless entry tainted the evidence seized pursuant to the warrant. The trial court denied the motion.

The case was tried to a jury. MD testified that (i) she worked as a prostitute; (ii) Guerra was her pimp; (iii) before the assault, Guerra had taken her to a motel in Tyler to work for a few days; (iv) her last client robbed her of the money she made; and (v) she was afraid to tell that to Guerra when he picked her up.

When Guerra figured out that MD lost the money, he left all of her belongings in the motel, took away her cell phones, and drove her back to Dallas. When they stopped at a gas station along the way, Guerra hit her in the face several times.

Guerra, his one year old daughter, and MD later went to a barbecue at one of his relative's house. Although Guerra told MD to stay in the car, his mother invited her inside. When Guerra, his daughter, and MD left the barbeque, they went to Guerra's house in Allen.

After he put his daughter to bed, Guerra went to the car to retrieve his laptop. MD said something that angered him, and he slapped her face. When they were back inside, Guerra told MD to get on her knees.

Guerra took a roll of duct tape and taped MD's mouth and nose, wrapping it around her entire head. He also taped her hands and legs together. She testified that she could not move her hands or feet, could not remove the tape, and was "pretty much confined." Guerra then hit her face with his hand. He went on to hit and kick her repeatedly, telling her that she was "going to learn" and "shouldn't play with his money." Guerra cursed MD and called her names. He kneed her in the mouth, knocking out a tooth, and then started hitting her in the face and head with a skillet. MD's mouth and face were bleeding, and she had a hard time breathing around the tape.

Guerra told MD that he was going to rape her with a knife, retrieved a serrated steak knife from the kitchen, and cut her shorts off her body. MD believed Guerra would rape and kill her.

Guerra then said he was "going to put his name on [her] legs so that [she] will always remember him" and began carving his nickname "Ace" into both of her legs.

Guerra dragged MD into the garage by her feet, hitting her head against the ground. He took a wrench or metal bar and pressed it against her throat, pushing down until she could not breathe and started to black out. MD thought she had to stay conscious or she would die.

Guerra seemed concerned when he heard a sound outside, so he told MD to be quiet and dragged her back into the house where he continued the beating, hitting her with the skillet and kicking her. MD thought the beating lasted for "a few hours."

When he decided to go to bed, Guerra wheeled MD into his bedroom in an office chair. He put her on the floor beside his bed, put a towel under her head, and said "bitch, don't bleed on my floor."

At some point, MD asked to use the bathroom. Guerra consented, so MD "flipped [herself] over and pulled [herself] to sit on [her] bottom and scooted into the bathroom." MD made a noise as she was trying to lift herself to the toilet. When Guerra did not make any noise, MD thought she could escape. She tried to "pull [her] legs apart" but was unable to do so. So she slipped both hands under the toilet seat until her hands "came apart." She was then able to remove the tape from her feet and crawled to the front door. She ran out the door to a neighbor's house and knocked on the door. When no one answered, she tried a house across the street. The residents heard her and called 911.

MD was later treated at the hospital for lacerations and contusions. She had a broken nose, a missing tooth, and bruises on her face and hands. Her eyes turned black, as did the bruises on her hands. It took "a couple of weeks" for the bruises and pain to fade. Eighteen months later at trial, MD still had scars on her thighs where Guerra carved his nickname.

DNA tests matched MD to the blood on the towel, the knife, the skillet, the shorts found in the bathroom, and blood stains throughout the house, and Guerra could not be excluded as a contributor to the DNA on the skillet, knife handle, and shorts. His fingerprint was on the knife handle.

The jury found Guerra guilty of aggravated kidnapping and aggravated assault and found an enhancement allegation of a prior felony to be true. The jury assessed punishment in each case at sixty years' imprisonment and a $10,000 fine.

## II. Analysis

### A. Issue 1: Was There Sufficient Exigency to Support a Warrantless Entry?

Guerra's first issue argues that the trial court erroneously denied his motion to suppress because the emergency doctrine does not justify the officers' warrantless entry into his home.[1] He further argues that, because that entry was not justified, the evidence seized after the warrant was issued was tainted.

We apply a bifurcated standard of review when reviewing a trial court's ruling on a motion to suppress. *Martinez v. State*, 348 S.W.3d 919, 922–23 (Tex. Crim. App. 2011). We afford almost total deference to a trial judge's determination of historical facts and mixed questions of law and fact that rely on witness credibility. *Id.* We review de novo pure questions of law and mixed questions of law and fact that do not depend on credibility determinations. *Id.*

The Fourth Amendment protects individuals from unreasonable searches and seizures. *See* U.S. CONST. amend. IV; *Mincey v. Arizona*, 437 U.S. 385, 390 (1978); *Luna v. State*, 268 S.W.3d 594, 603 (Tex. Crim. App. 2008). The emergency doctrine, however, is an exception to the warrant requirement. *Laney v. State*, 117 S.W.3d 854, 860 (Tex. Crim. App. 2003).

Under the emergency doctrine, officers may engage in conduct that otherwise violates the Fourth Amendment if they are acting under a reasonable belief that their actions are immediately necessary to protect or preserve life or avoid serious injury. *Mincey*, 437 U.S. at 392; *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008). The doctrine applies when police are acting, not in their "crime-fighting" role, but in their limited community caretaking role to "protect or preserve life or avoid serious injury." *Laney*, 117 S.W.3d at 861 (quoting *Mincey*, 437 U.S. at 392). The officer's conduct must be "totally divorced from the detection,

---

[1] The court conducted a hearing on the motion to suppress. When the hearing concluded, the trial court took the matter under advisement. The Court later issued a written order that suppressed Guerra's statements to officers when they first entered the home, but otherwise denied the motion to suppress.

–5–

investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 862.

Whether an actual emergency existed at the time of the officers' warrantless entry is irrelevant. *See Brimage v. State*, 918 S.W.2d 466, 482 (Tex. Crim. App. 1994). Rather, the State need show only that the facts and circumstances surrounding the entry were such that the officers reasonably believed an emergency existed that made obtaining a search warrant impracticable. *Id.*

The State assumed the burden at the suppression hearing and stipulated that a warrant was not involved. *See Bishop v. State*, 85 S.W.3d 819, 822 (Tex. Crim. App. 2002). Officers Ruatta, Dodson, LeBlanc, and May, the officers who responded at the scene, testified about the decision to enter the home without a warrant.

The officers testified that they responded to a 911 call to a residence in Allen at approximately 2:30 in the morning. When they arrived, they saw MD in a distressed condition sitting on the front lawn of a residence. Her clothes were disheveled, she was not wearing any pants, and she had black tape covering most of her face and on her hands. She was crying and hysterical and it appeared that she had been assaulted. She had cuts to her legs that appeared to be from a sharp object and her nose was red and swollen. Photographs showing MD's appearance when the officers arrived were admitted into evidence.

MD told the officers that she had been assaulted in a house across the street. When Officer May saw MD's condition, he "thought some horrific crime had just occurred."

Officer LeBlanc described MD's condition as something that "shocked his conscience." He said that he had seen some crazy things in his eleven years as a police officer but had "never seen anything like this." According to Officer LeBlanc, MD looked "like Hannibal Lecter."

When the fire department arrived to treat her, MD said that she had been hit with a skillet and a wrench and had a tooth knocked out.

Although she was having difficulty communicating, MD told the officers that there was a one year old child in the home. When Officer LeBlanc learned this, it "concerned [him] greatly." Given MD's injuries, Officer LeBlanc was concerned that the person who assaulted her might injure someone else.

Officer Dodson said he was "really concerned" because MD was hysterical and "a very violent incident had occurred."

The other officers echoed these sentiments. The officers did not know if there was anyone else in the home who might need help. Because they were concerned about a child's safety, they decided to go to the house and knock on the door. When they knocked, the door was ajar and opened on its own. Officer Dodson thought it unusual that the door was unlocked and unsecured that early in the morning. When nobody answered after they announced their presence, the officers entered the house.

The officers located the child asleep in bed with Guerra. Guerra was surprised and initially resisted the officers efforts to handcuff him. One of the officers took charge of the child. As the officers handcuffed Guerra, Officer Dodson saw Guerra try to kick a bloody towel under the bed. There was a skillet missing a handle on the nightstand.

The officers did a sweep of the remainder of the home to see if other people were inside. When they did so, Officer Dodson saw an entire tooth, including the root, on the den floor. He told another officer to photograph the tooth because he thought it might be needed at the hospital. Although the officers searched the home to see if anyone else was there, they did not search for or seize any evidence.

-7-

After they obtained a search warrant, the police retrieved the bloody towel, the bloody knife, the broken skillet, the tooth, and the shorts.

The officers admitted that, when they decided to enter the home, they did not have any specific information that there was anyone in danger in the residence or that Guerra had hurt the child. But given MD's injuries and the information they had, they were concerned that a child might be in peril.

On these facts, we conclude that the trial court did not erroneously deny the motion to suppress. The facts and circumstances demonstrate that the officers reasonably believed an emergency existed and immediate action was required. We thus resolve Guerra's first issue against him.

## B. Issues 2 and 3: Is the Evidence Sufficient to Support the Convictions?

Guerra's second and third issues argue that the evidence is insufficient to support his aggravated assault and aggravated kidnapping convictions. When reviewing a sufficiency of the evidence challenge, we examine the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard accounts for the factfinder's duty to resolve testimonial conflicts, weigh the evidence, and draw reasonable inferences from basic to ultimate facts. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). When analyzing the sufficiency of evidence, we "determine whether the necessary inferences are reasonable based on the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict" and treat direct and circumstantial evidence equally. *Id.*

## Aggravated Assault

Guerra challenges the aggravated assault conviction by arguing that the evidence is insufficient to prove he used a deadly weapon while assaulting MD because her injuries were not serious bodily injuries. The State, however, responds that (i) actual injury is not required, and (ii) the skillet and the steak knife Guerra used on MD were capable of causing, and did cause, serious bodily injury. For the reasons discussed below, we agree with the State.

One commits an aggravated assault if he or she uses or exhibits a deadly weapon during the assault. TEX. PENAL CODE ANN. § 22.01(a)(2) (West 2011). A "deadly weapon" is "anything manifestly designed, made, or adapted for the purpose of inflicting serious bodily injury" or "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 1.07(a)(17)(A)(B). "Serious bodily injury" is bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ. *Id.* § 1.07(a)(46).

Whether an object was capable of causing death or serious bodily injury is evaluated based on the circumstances that existed at the time of the offense. *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005). "Objects that are not usually considered dangerous weapons may become so, depending on the manner in which they are used during the commission of an offense." *Hernandez v. State*, 332 S.W.3d 664, 667 (Tex. App.—Texarkana 2010, no pet.) (citing *Thomas v. State*, 821 S.W.2d 616, 620 (Tex. Crim. App. 1991)). For example, a skillet can be used as a deadly weapon. *See Bailey v. State*, No. 10-07-00381-CR, 2008 WL 5246683, at *4 (Tex. App.—Waco Dec. 17 2008, pet. ref'd) (mem. op. not designated for publication). So can a steak knife. *See Issac v. State*, No. 05-10-00492-CR, 2011 WL 5386371, at *4–5 (Tex. App.—Dallas Nov. 9, 2011, no pet.) (mem. op. not designated for publication).

MD's treating emergency room physician testified that the skillet found in Guerra's home could cause serious bodily injury because it could kill someone, cause a skull fracture, bruise the brain, and break facial bones. He also said that the steak knife could cause serious bodily injury if used to cut someone's legs because it could cause long-term scarring and blood loss. The doctor examined MD's legs on the day of trial, and the scarring was still visible. He further said that the knife would also be a deadly weapon if it was used to rape a woman because it could cause damage to the vagina, bladder, uterus, ovaries, and rectum. And he testified that MD's tooth loss was a serious bodily injury because it was a permanent loss that could only be replaced by dental work and would cause difficulty cosmetically and with chewing.

Detective Tim Wadsen of the Allen Police Department testified that the knife and skillet used to assault MD were capable of causing death or serious bodily injury.

Moreover, "the injuries suffered by the victim can by themselves be a sufficient basis for inferring that a deadly weapon was used." *Tucker v. State*, 274 S.W.3d 688, 691–92 (Tex. Crim. App. 2008). The scars on MD's legs, visible eighteen months after the assault, were a significant cosmetic disfigurement. *See Willams v. State*, No. 05-08-01474-CR, 2010 WL 2978406, at *3 (Tex. App.—Dallas July 30, 2012, no pet.) (mem. op. not designated for publication) (permanent scarring constituted serious bodily injury). MD's tooth loss was also a serious bodily injury because it was permanent and caused both deformity and difficulty chewing. *See McCoy v. State,* No. 11-13-00099-CR, 2015 WL 1756768, at *1 (Tex. App.—Eastland Apr. 16, 2015, no pet. h.) (mem. op. not designated for publication) (missing teeth constituted serious bodily injury).

We therefore conclude that the evidence was sufficient to establish that Guerra used a deadly weapon that caused, or was capable of causing, serious bodily injury during the assault and resolve his second issue against him.

—10—

## Aggravated Kidnapping

Guerra contends that the evidence is insufficient to support his aggravated kidnapping conviction because the State failed to prove either (i) restraint or (ii) abduction. Specifically, Guerra argues the State did not prove *restraint* because he did not move MD from one place to another or confine her. And he argues the State did not prove *abduction* because he did not (a) secrete MD somewhere she could not be found or (b) threaten to use deadly force.[2]

One commits aggravated kidnapping if he or she intentionally or knowingly abducts another person and uses or exhibits a deadly weapon while committing the offense. *See* TEX. PENAL CODE ANN. § 20.04(b) (West 2011). Under this statute, abduct "means to restrain a person with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force." *Id.* § 20.01(2). Restrain "means to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person." *Id.* § 20.01(1). Restraint is "without consent" if "accomplished by force, intimidation, or deception." *Id.* § 20.01(1)(A); *see also Holmes v. State*, 873 S.W.2d 123, 126 (Tex. App.— Fort Worth 1994, no pet.) (explaining that "[c]onfining . . . may include shutting up, imprisoning, enclosing, detaining, relegating to certain limits, or trapping victim").

There are many ways in which one may be "restrained" under the kidnapping statute, and the law "imposes no minimal requirement for restraint other than that the interference with the victim's liberty be substantial." *Rogers v. State*, 687 S.W.2d 337, 342 (Tex. Crim. App. 1985).

As the court of criminal appeals explained:

---

[2] The indictment charged the offense three different ways, asserting that Guerra abducted MD: (i) with the intent to terrorize her, restricting her movements by confining her, holding her in a place she was not likely to be found, and threatened deadly force; (ii) with the intent to inflict bodily injury, restricted her movements by confining her, held her in a place she was not likely to be found, and threatened to use deadly force; and (iii) confined her, held her in a place she was not likely to be found, threatened to use deadly force, and used or exhibited a deadly weapon.

> [T]here is nothing in the Texas statute that even suggests that it is necessary for the State to prove that a defendant moved his victim a certain distance, or that he held him a specific length of time before he can be found guilty of kidnapping. In fact, we have consistently held that under the kidnapping statute, there is no specific time requirement for determining whether a restraint has taken place.

*Hines v. State*, 75 S.W.3d 444, 447–48 (Tex. Crim. App. 2002). To determine whether there was substantial interference with the victim's liberty, we look at all of the circumstances surrounding the offense. *Id.* at 448.

Here, the surrounding circumstances show both abduction and restraint. As to restraint, MD said she could not move her hands or feet when Guerra taped them, and "was pretty much confined." Guerra moved her throughout the house while she was bound. He dragged her into the garage, then back to the living room, and then wheeled her into his bedroom in a chair. During this time, she was unable to get the tape off and get out of the house on her own. When Guerra went to bed, he placed MD on the floor beside him, which the jury could reasonably infer was to prevent her from escaping. MD was restrained because she was confined and Guerra moved her from one place to another.

The evidence is also sufficient to establish that Guerra abducted MD by using or threatening deadly force or by secreting her in a place she could not be found. Guerra argues that MD could not have been abducted because she entered his home voluntarily. But the evidence shows that Guerra took steps to prevent her from leaving the house once she was there. As previously discussed, Guerra restrained her and used a deadly weapon that could and did inflict serious bodily injury. In addition to the injuries caused by the knife and the skillet, Guerra threatened to rape MD with the knife. He taped her mouth, presumably so no one could hear her. When Guerra was choking MD in the garage and thought he heard a noise outside, he told her to be quiet and dragged her back into the living room. From these facts, the jury could reasonably infer that Guerra intended to secrete MD where she could not be found.

For these reasons, we conclude that the evidence is sufficient to support the aggravated kidnapping conviction and resolve Guerra's third issue against him.

## C. Issue 4: Was the *Batson* challenge erroneously denied?

There were five African-American people on the venire panel. One was removed by agreement, one was struck by Guerra, and three were struck by the State. Following voir dire, Guerra raised, and the trial court denied, a *Batson* challenge to the State's three strikes. *See Batson v. Kentucky*, 476 U.S. 79, 89 (1986). Guerra's fourth issue challenges that ruling.

In *Batson*, the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution forbids the state from exercising its peremptory strikes based solely on the race of a potential juror. *Id.* at 89; *Nieto v. State*, 365 S.W.3d 673, 675 (Tex. Crim. App. 2012). A single impermissible strike for a racially motivated reason requires a new trial. *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008).

We review the denial of a *Batson* challenge based on the record in the light most favorable to the trial court's ruling, which we do not disturb unless it is clearly erroneous. *Young v. State*, 283 S.W.3d 854, 866 (Tex. Crim. App. 2009). A ruling is not clearly erroneous if it is supported by the record. *Vargas v. State*, 838 S.W.2d 552, 554 (Tex. Crim. App. 1992).

A *Batson* challenge has three steps. *Nieto*, 365 S.W.3d at 675. One, the defendant must make a prima facie showing of racial discrimination in the State's use of a peremptory strike. *Id.*

Two, if the defendant makes that showing, the State must articulate a race-neutral reason for its strike. *Id.* That explanation does not have to be "persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). Instead, "the issue is the facial validity of the [State]'s explanation. Unless a discriminatory intent is inherent in the [State]'s explanation, the reason offered will be deemed race neutral." *Id.* (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (plurality opinion)).

-13-

Three, once the State offers a race-neutral reason for its strike, the defendant has the burden to show that the reason was pretextual. *Wamget v. State*, 67 S.W.3d 851, 859 (Tex. Crim. App. 2001). In determining whether a reason is pretextual, the trial court may consider a variety of factors, including (1) the State's use of peremptory strikes in a higher proportion against panel members of a certain race than other panelists; (2) disparate treatment of similarly situated panel members of a different race; (3) use of a panel shuffle in a manner that shows discriminatory intent; (4) directing questions designed to elicit grounds for a peremptory strike against members of a certain race; and (5) a policy of purposeful discrimination. *Watkins v. State*, 245 S.W.3d 444, 448–49 (Tex. Crim. App. 2008).

Because the State offered its reasons for the strikes, the prima-facie-case inquiry is moot, and we consider whether it offered race-neutral reasons for its strikes and whether the court properly concluded that these reasons were not pretextual. *Johnson v. State*, 68 S.W.3d 644, 649 (Tex. Crim. App. 2002).

### Panel Member 16

The State said panel member 16 was struck because he had a DWI that was less than two years old and was prosecuted in Collin County. The Court found this to be a race-neutral reason for the strike.

Defense counsel responded that the crime for which the panel member had been convicted was not one of moral turpitude and "other people that had contacts, Caucasian people, I believe, that had contacts with the DA's office that were not struck." The record shows that three other panelists had criminal charges. One of these panelists was dismissed by agreement. The State said that the other two panelists who were not struck had charges that were more than ten years old. Striking a person with a recent criminal conviction but not striking others with older convictions does not show racial discrimination. *See Gatewood v. State*, No. 2-10-00169-

–14–

CR, 2011 WL 5903656, at \*4 (Tex. App.—Fort Worth Nov. 23, 2011, pet. ref'd) (mem. op. not designated for publication).

### Panel Member 27

The prosecutor said that she struck panel member 27 because she rated a two and a four on the State's and defense's questions about rehabilitation and deterrence and because she had a relative who had recently been convicted in Dallas of conspiracy. Defense counsel responded that panel member 28, a non-minority, had a son with drug charges and she was not struck. The prosecutor replied that she viewed the conspiracy charge as more serious than the drug charge, and panel member 28 ranked a three and a six on the rehabilitation and deterrence ranking system. Defense counsel offered no further argument or evidence concerning potential pretext.

Striking a person for their relative's involvement in the criminal justice system is a race-neutral reason. *Simpson v. State*, 119 S.W.3d 262, 267–68 (Tex. Crim. App. 2003). So is a strike based on a prospective juror's rankings of rehabilitation, deterrence, and punishment. *Crew v. State*, No. 05-08-00959-CR, 2009 WL 2712386, at \*5 (Tex. App.—Dallas Aug. 31, 2009, pet. ref'd) (mem. op. not designated for publication). After the prosecutor proffered her reasons for the strike, defense counsel did not offer any further evidence showing an impermissible motive for the strike.

### Panel Member 47

The prosecutor said that she struck panel member 47 because she was a college broadcast journalism professor and she considered "certain types of professions . . . psychologists, social sciences, journalism . . . typically a little more liberal than other types." She further explained "I'm looking at people I think might be a little more liberal, might be people who would punish less than I want, and in my mind that's a professor of journalism." She also said that this panel member had a relative accused of a crime in California and had expressed the opinion that the

–15–

bail was too high in that case. The prosecutor further stated that she would have struck the psychologist who was on the panel, but she was a challenge for cause. She also struck a Caucasian woman because she was an attorney.

Guerra argues that the State struck panel member 47 "because of her allegedly liberal profession, a college professor," and that the strike "showed disparate treatment, as other highly educated non-minorities were not struck." We disagree.

The State's stated reason for the challenge shows that panel member 47 was not struck because she was highly educated. Instead, the State struck her because of her profession and the subject-matter she taught. When the prosecutor explained her reasons for the strike, she said she might not have struck a college professor who taught a different subject-matter. Guerra did not identify other panelists who were college professors who were not struck or who had relatives involved in the criminal justice system and expressed a specific opinion about the system. Thus, Guerra failed to prove that the State's reasons for the strikes were pretextual.

The record shows that the State provided the court with a credible, race-neutral explanation for the challenged strikes. The trial court found the State's reasons for striking the potential jurors to be non-discriminatory. The record supports those findings, which are not clearly erroneous.

Furthermore, appellant did not meet his burden on the third step—to prove that the State's race-neutral explanations were incorrect or a pretext for discrimination. *Johnson*, 68 S.W.3d at 650.

Therefore, affording great deference to the trial court's ruling, we conclude that Guerra did not carry his burden to show that the trial court's denial of his *Batson* challenge was clearly erroneous and decide Guerra's fourth issue against him.

## D. Issue 5: Is the Deadly Weapon Finding a Clerical Error?

Guerra's fifth issue argues that the deadly weapon finding in the aggravated kidnapping judgment is a clerical error and that there is insufficient evidence to support it. We reject both premises.

Nothing in the record suggests that the deadly weapon finding was a clerical error. The indictment charged Guerra with using and exhibiting a deadly weapon while committing the offenses, specifically, "a skillet, knife, wrench, and t-shirt that in the manner of its use and intended use was capable of causing death and serious bodily injury." When an indictment alleges the use of a deadly weapon and the jury finds the defendant guilty "as alleged in the indictment," the jury has implicitly made a deadly weapon finding that must be reflected in the judgment. *See Ex Parte Poe*, 751 S.W.2d 873, 876 (Tex. Crim. App. 1988); *see also Polk v. State*, 693 S.W.2d 391, 394 (Tex. Crim. App. 1985) (affirmative deadly weapon finding made when indictment places issue before trier of fact and defendant found guilty as charged in indictment); *Crumpton v. State*, 301 S.W.3d 663, 664 (Tex. Crim. App. 2009) (same).

Here, the jury found Guerra guilty as charged in the indictment, so there is no question that there was an affirmative deadly weapon finding.

Moreover, although the deadly weapon finding on the judgment's first page states "N/A," the trial court made a specific finding on page three that, "the Court FINDS Defendant used or exhibited a deadly weapon, namely a knife and skillet . . . ." Guerra does not explain why this specific finding, rather than the first page finding, is a clerical error. Indeed, given the indictment charging the use of a deadly weapon, the verdict, and page three's greater specificity, we conclude that that the finding on page one is the typographical error.

Guerra further contends that the evidence is insufficient to support a deadly weapon finding because there is no evidence that "the tape (or other object)" facilitated the kidnapping.

Guerra relies on *Plummer v. State*, 410 S.W.3d 855, 859–60 (Tex. Crim. App. 2013) to support his argument. That reliance is misplaced.

The *Plummer* Court held that, "the mere possession of a deadly weapon during a felony offense is not covered by the statute." *Id.* at 864. Rather, a deadly-weapon finding for a felony offense can only be made when "the deadly weapon facilitates the associated felony." *Id.* In that case, the defendant was wearing body armor and a holstered firearm in an attempt to look like a security guard. He was convicted of the unlawful possession of a firearm by a felon and the unlawful possession of a body armor by a felon. The court of criminal appeals held that the appellate court erroneously upheld a deadly weapon finding because there was "no facilitation connection" between the two offenses. *Id.* at 865. Instead, the defendant simply possessed the gun when he also possessed the body armor. *Id.*

Here, the record demonstrates that Guerra did not simply possess a skillet and a knife at the time of the kidnapping. He actively used the knife and the skillet to facilitate committing the kidnapping and to terrorize MD. After taping MD so she could not scream or move, Guerra dragged her around the house, beat her with the skillet, said he was going to rape her with the knife, and carved his name into her legs with the knife while telling her he was going to teach her a lesson about stealing from him. The trial court thus did not err in making a deadly weapon finding. We thus resolve Guerra's fifth issue against him.

## D. Modification of the Judgments

In a cross-point, the State asks us to correct the judgments to reflect the assessment of a $10,000 fine. We can modify an incorrect judgment and make the record "speak the truth" when we have the necessary data and information to do so. TEX. R. APP. P. 43.2(b); *see Woods v. State*, 398 S.W.3d 396, 406 (Tex. App.—Texarkana 2013, pet. ref'd).

–18–

The record reflects that the jury assessed punishment for both offenses at sixty years' imprisonment and a $10,000 fine. Neither judgment, however, includes the $10,000 fine. We therefore modify both judgments to reflect the $10,000 fine. As modified, both judgments are affirmed.


Do Not Publish                                    /Bill Whitehill/
TEX. R. APP. P. 47                                BILL WHITEHILL
140086F.U05                                       JUSTICE

# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

JOSEPH JULIAN GUERRA, Appellant

No. 05-14-00086-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 219th Judicial District Court, Collin County, Texas
Trial Court Cause No. 219-82353-2012.
Opinion delivered by Justice Whitehill.
Justices Francis and Lang-Miers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** to read "Fine: $10,000."
As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered June 10, 2015.

—20—

# Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

JOSEPH JULIAN GUERRA, Appellant

No. 05-14-00087-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 219th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 219-81886-2013.
Opinion delivered by Justice Whitehill.
Justices Francis and Lang-Miers
participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** to read "Fine: $10,000."
As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered June 10, 2015.

JOSEPH Guererd # 1909129
Roberson Unit
12071 FM 3522
SRP 2
Abilene Tx 79601

nal Appeals